UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA


| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | 13-MJ-00635-1 |
| | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| ADAM KOKESH, | ) | Philadelphia, PA |
| | ) | May 23, 2013 |
| Defendant. | ) | 1:35 p.m. |


TRANSCRIPT OF HEARING
BEFORE THE HONORABLE THOMAS J. RUETER
UNITED STATES MAGISTRATE JUDGE


APPEARANCES:

For the Government:      RICHARD W. GOLDBERG, ESQUIRE
                        ASSISTANT UNITED STATES ATTORNEY
                        UNITED STATES ATTORNEY'S OFFICE
                        615 Chestnut Street
                        Suite 1250
                        Philadelphia, PA  19106-4476


For the Defendant:      JAMES J. McHUGH, JR., ESQUIRE
                        DEFENDER ASSOCIATION OF PHILADELPHIA
                        601 WALNUT STREET
                        SUITE 540
                        INDEPENDENCE SQUARE WEST
                        PHILADELPHIA, PA  19106

Audio Operator:         NELSON MALAVE




Transcribed by:         DIANA DOMAN TRANSCRIBING
                        P.O. Box 129
                        Gibbsboro, NJ  08026-0129
                        Office:  (856) 435-7172
                        Fax:     (856) 435-7124
                        E-mail:  dianadoman@comcast.net


Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

1                                I N D E X

2

3    WITNESS                  DIRECT   CROSS   REDIRECT   RECROSS

4    FOR THE GOVERNMENT

5    DONALD REED              3(Nat)   5       36

6

7    EXHIBITS                          IDENT.   EVIDENCE

8    G-1  Affidavit                             5

9    ARGUMENT                                   PAGE

10     By Mr. McHugh                            37, 47

11     By Ms. Natale                            42

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Colloquy                                      3

```
 1          (The following was heard in open court at 1:40 p.m.)

 2               THE COURT:  Mr. McHugh.

 3               MR. McHUGH:  Good afternoon, Your Honor.

 4               THE COURT:  Okay, we're scheduled for a probable

 5     cause hearing and a detention hearing.  Are you ready to

 6     proceed, Mr. McHugh?

 7               MR. McHUGH:  Yes, we are, Your Honor.

 8               THE COURT:  Okay, I'll hear from the Government.

 9               MR. GOLDBERG:  Thank you, Your Honor.  If I may, I

10     may defer to my colleague.

11               THE COURT:  Okay, sure.

12               MR. GOLDBERG:  Thank you, Your Honor.

13               MS. NATALE:  Good afternoon, Your Honor.  The

14     Government calls Donald Reed.

15               THE COURT:  Mr. Reed.

16                DONALD REED, GOVERNMENT'S WITNESS, SWORN

17               THE CLERK:  Please state your name for the record.

18               THE WITNESS:  Donald Reed.

19               THE CLERK:  Please spell your last name.

20               THE WITNESS:  R-E-E-D.

21               THE COURT:  You may proceed.

22                          DIRECT EXAMINATION

23     BY MS. NATALE:

24     Q    Can you please state your name?

25     A    Donald Reed.
```

Reed - Direct (Nat)                                          4

1    Q     By whom are you employed?

2    A     National Park Service Independence National Historical

3    Park.

4    Q     How long have you been with the National Park Service?

5    A     Approximately 24 years.

6    Q     And what's your current title there?

7    A     Current title is law enforcement specialist.

8    Q     How long have you had that title?

9    A     Right around eight years.

10   Q     And you're assigned to Independence National Historical

11   Park right across the street from the courthouse here?

12   A     That is correct.

13   Q     Okay.  And as your duties as a law enforcement specialist

14   with Independence National Historical Park, does that include

15   investigating criminal violations in the park?

16   A     Yes, it does.

17   Q     Okay.  Did you prepare an affidavit in support of the

18   complaint and warrant, the arrest warrant of the defendant

19   Adam Kokesh?

20   A     Yes, I did.

21   Q     And did you bring a copy of that with you here today?

22   A     Yes, I did.

23   Q     Okay.  Is it true and correct?

24   A     Yes, it is.

25   Q     Do you adopt that as your testimony here today?

1    A    Yes, I do.

2               MS. NATALE:  Your Honor, I'd move for the admission

3    of the affidavit for the purposes of the probable cause

4    hearing, and the Government doesn't have any further questions

5    at this time.

6               THE COURT:  The affidavit and complaint is admitted.

7    You may proceed, Mr. McHugh.

8               MR. McHUGH:  Thank you, Your Honor.

9                            CROSS-EXAMINATION

10   BY MR. McHUGH:

11   Q    Mr. Reed, I'm going to go through this affidavit with

12   you.  I have some questions for you.

13               In paragraph 1, you indicated that you had worked

14   for eight years in the position of law enforcement specialist,

15   is that correct?

16   A    Correct.

17   Q    Prior to that what was your position with the United

18   States National Park Service?

19   A    A law enforcement park ranger.

20   Q    Okay.  And was that basically from eight years back to

21   when you first started as a park ranger?

22   A    No, I've actually been with the National Park Service for

23   close to 25 years now.

24   Q    Okay.  So, after your position as park ranger, what were

25   you before that?

1    A    That was just it.  It's just park ranger.  There was

2    nothing before that.

3    Q    All right.  So you were a park ranger up until eight

4    years ago when you became a law enforcement specialist, is

5    that fair to say?

6    A    Yes.

7    Q    Okay.  Looking at paragraph 2 -- and you have a copy of

8    the affidavit in front of you, is that correct?

9    A    Yes, sir.

10   Q    Okay.  In paragraph 2, you indicate there that you

11   received reports from -- "I know the following from reports

12   from my own observations and those of other law enforcement

13   officers," do you see that?

14   A    Yes, sir.

15   Q    Okay.  The other law enforcement officers, do you recall

16   who gave you reports concerning this incident?

17   A    I believe so, yes.

18   Q    And who would that be?

19   A    Names, is that what you're looking for I guess?

20   Q    Well, how else would I know -- I'm asking who are they.

21   A    Okay.  Let's see, there were approximately 30 to 35

22   rangers, there were close to 50-some police officers that I

23   would not -- I would not have that information.

24   Q    Okay.  So you can't name specifically who you got these

25   reports from?

1          MS. NATALE:  Your Honor, is he asking for a list of

2     all 50 names or --

3          MR. McHUGH:  Well, originally, but he indicated he

4     can't give it.

5          MS. NATALE:  Okay.

6          MR. McHUGH:  Is that right --

7          THE COURT:  Do you recall any of the names?

8          THE WITNESS:  Some of these, yes, I do recall.

9          THE COURT:  You want some of the names, Mr. McHugh?

10          MR. McHUGH:  Yes.

11     A    Okay.  Keith Manchester, Eli Bowers, Michael, or Matthew

12     Edgar.

13     Q    And are these rangers?

14     A    These are rangers here at Independence National

15     Historical Park.

16     Q    Okay, thank you.

17     A    Continue?

18     Q    Are there others you recall?

19     A    Yes.

20     Q    Yes, please.

21     A    Okay.  Our chief ranger Patrick Suddath, Alan Saperstein,

22     Brian Pastowski (phonetic), Sinclair Reidberg (phonetic), Ryan

23     McLeod.

24          MS. NATALE:  Your Honor, this all will be provided

25     in discovery.  We'll provide a list of all the reports.

 1  BY MR. McHUGH:

 2  Q    Of the people that you've named, are they all park

 3  rangers?

 4  A    Yes, sir.

 5  Q    Okay.  The reports that you received, I count that you've

 6  identified eight individuals, is that right?  Those reports,

 7  were they verbal or in writing?

 8  A    In writing.

 9  Q    Okay.  So you received -- of the 50 -- or I'm sorry, I

10  think you said approximately 80 people you talked to about

11  this incident, is that about right?

12  A    No, I didn't talk to all 80.

13  Q    That's the number of people that were out there, is that

14  right?

15  A    That's correct.

16  Q    Okay.  Do you have an estimate of the number of people

17  you talked to in order to make your affidavit?  That's what I

18  was getting at.

19  A    An approximate number would be 25, I guess.

20  Q    And were they all in the form of written reports?

21  A    Yes.

22  Q    Okay.  Moving down into that paragraph it says, "I have

23  not included all the information in my possession about the

24  events described."

25              What other information do you have in your

1   possession that you did not include?

2            MS. NATALE:  Objection, Your Honor.  It's

3   irrelevant.

4            THE COURT:  Overruled.  You may proceed.  Do you

5   want to repeat the question.

6   BY MR. McHUGH:

7   Q    There's a reference about you have other information in

8   your possession.  Do you see that, sir?

9   A    Yes.

10  Q    Okay.  What is it that you did not disclose?

11           What are you referring to there, sir, is my

12  question?

13  A    As far as -- the limited amount for probable cause

14  determination.

15  Q    Okay.  So would it be fair to say you've included all of

16  what you felt were the relevant facts in this affidavit of

17  probable cause?

18  A    A summary of.

19  Q    A summary of all of the relevant facts, is that what

20  you're saying?

21  A    Yes.

22  Q    Okay.  Now moving to paragraph 3, you indicate there that

23  the organizers of this event had obtained a permit from the

24  park for the event, do you see that?

25  A    Yes, sir.

1   Q    Okay.  Who were these organizers that you're referring to

2   there?

3   A    I don't have a copy of the permit with me.

4   Q    Okay.

5   A    The organizers of the event were Hip-Hop Philadelphia, I

6   think.  I don't have that in front of me, sir.

7   Q    You're not -- you can't recall at this time.  Is that

8   fair to say?

9   A    At this time, yes, thank you.

10  Q    But you would agree with me that Mr. Kokesh, my client,

11  was not an organizer of the event, is that fair to say?

12           MS. NATALE:  Objection, Your Honor.  He said he

13  didn't have the paperwork in front of him.

14           THE COURT:  Overrule the objection.  You can answer

15  if you know.

16  A    I don't know.

17  Q    You don't know if he was an organizer of the event?

18  A    No, I don't.

19  Q    Okay.  Then do you know who -- the same question, if you

20  don't know, just say you don't recall -- do you know who

21  obtained the permit?

22  A    No.

23  Q    Okay.  Paragraph 4, it says there that, "Because at past

24  such events there had been claims that marijuana was

25  possessed," do you see that, sir?

1   A    Yes, sir.

2   Q    What are you talking about there?  Who made those claims?

3   A    There were claims from visitors.

4   Q    Are those written, are they written?

5   A    What's that?

6   Q    You received a written complaint or a claim?

7   A    No, it would have been a verbal, verbal complaint.

8   Q    But that was recorded by the park service?

9   A    Excuse me?

10  Q    Was that, the verbal complaint was recorded by the park

11  service?

12          MS. NATALE:  Objection, Your Honor.  Whether or not

13  it was recorded isn't really relevant to this probable cause

14  hearing.  Again, we'll provide all the reports in discovery.

15          THE COURT:  I'll sustain the objection.  You may

16  proceed.

17  BY MR. McHUGH:

18  Q    Can you identify anybody who made a claim that marijuana

19  was possessed --

20          MS. NATALE:  Objection, Your Honor.

21  Q    -- by name, can you identify any of the names of the

22  individuals?

23          THE COURT:  Sustain the objection.

24  Q    Were any of the individuals that made these claims law

25  enforcement?  If you recall.

1    A    Yes.

2    Q    Okay.  Do you recall what part of law enforcement they

3    were, what agency?

4    A    They would be with the National Park Service.

5    Q    Okay.

6    A    At Independence.

7    Q    Thank you, sir.  Now, in paragraph 4 it indicates that,

8    "Because of these claims, the area was posted by the park with

9    signs."  Do you see that?

10   A    Yes, sir.

11   Q    Okay.  Who ordered the posting of the signs?

12            MS. NATALE:  Objection.  What relevance is that?

13            THE COURT:  Overrule the objection.  You may

14   proceed.

15            THE WITNESS:  Your question again, please?

16   BY MR. McHUGH:

17   Q    You put in your affidavit in paragraph 4 that the area

18   was posted by the park, do you see that?

19   A    Yes, sir.

20   Q    Okay.  Who ordered that?

21   A    That would be our superintendent of the park.

22   Q    Name?

23   A    Cynthia MacLeod.

24   Q    Okay.  And it indicates there that the "signs reminding

25   the public that possession of marijuana in the park is

1  illegal," do you see that?

2  A    Yes, sir.

3  Q    Is that exactly what the signs said or are you

4  paraphrasing there?

5  A    Paraphrasing.

6  Q    Okay.  Do you recall exactly what the signs said?

7  A    It gave reference to a 36 CFR charge for the possession

8  of, the possession of drugs.

9  Q    Right.  Did it use the word controlled substance?

10  A    I don't think it did.

11  Q    Okay.  It didn't use the word marijuana, did it?

12  A    No, sir.

13  Q    Okay.  So the signs that were posted didn't mention

14  anything about marijuana specifically, did they?

15  A    No, sir.

16  Q    That means they did not, is that right?

17  A    They did not.

18  Q    Okay.  Now, I want you to go to paragraph 5.  Do you see

19  that, sir?

20  A    Yes, sir.

21  Q    Okay.  Now earlier in paragraph 2, you indicated that

22  this affidavit was based reports that you had received from

23  law enforcement, is that right?

24  A    Yes.

25  Q    As well as your own observations, is that right?

1    A     Yes.

2    Q     Okay.  So would it be fair to say you were out there on

3    this day in question?

4    A     Yes, I was.

5    Q     Okay.  Paragraph 5 obviously, is that a typo there as far

6    as the name of my client?

7    A     Yes.

8    Q     Okay.

9    A     Type error?

10   Q     Well, his name is not Richard, is it?

11   A     No.

12   Q     Okay, so we can correct that.

13   A     Not that I know, yes.

14   Q     Okay.  It indicates that Mr. Kokesh was addressing the

15   group over the loudspeaker system, do you see that?

16   A     Yes.

17   Q     Okay.  Did you hear him address the group?

18   A     Yes, I did.

19   Q     Okay.  You didn't hear him make any type of threats, did

20   you?

21   A     No, sir.

22   Q     Okay.  And in fact, the person who did the countdown to

23   smoke the marijuana was Mr. Tamaccio, is that right?

24   A     From my understanding, yes.

25   Q     Well, when you say your understanding, did you hear that?

1   A    I would say that that is a yes.

2   Q    Okay.  Then it indicates in that same paragraph, "The

3   crowd was also urged over the loudspeaker to form a tight

4   circle."  Do you see that?

5   A    Yes, sir.

6   Q    Do you know who did that, who said that?

7   A    Who said that?

8   Q    Yes.

9   A    Tamaccio.

10  Q    Okay.  And by the way, did he use the term tight circle

11  or are you paraphrasing?

12  A    No, he used the term tight circle.

13  Q    Okay.  And then it said, "to hinder law enforcement."

14  A    That's correct.

15  Q    Did Tamaccio say form a tight circle to hinder law

16  enforcement?

17  A    It was along those lines of him saying that, to make it

18  more difficult for the police.

19  Q    Okay.  Is that the best of your recollection, he said to

20  make it more difficult for the police?

21  A    Yes.

22  Q    Okay.  But again, that was Tamaccio who said that, is

23  that right?

24  A    Yes, sir.

25  Q    Okay.  Now moving to paragraph 6, it indicates there

1    that, "National Park Service rangers approached."  Do you see

2    that very beginning of the paragraph?

3    A    Yes, sir.

4    Q    Would that have been all 30 to 35 park rangers?

5    A    No, it would not.

6    Q    How many approached, if you recall?

7    A    Approached members of the crowd who were seen in

8    possession of what appeared to be -- this is referencing --

9    approached members of the crowd who were seen in possession of

10   what appeared to be marijuana cigarette.

11   Q    Right.  My question is the very beginning of that

12   sentence says, "National Park Service rangers approached."

13   A    Right.

14   Q    How many approached?

15   A    That would be --

16            MS. NATALE:  Objection, Your Honor.  Again, this

17   will all be provided in discovery at a later date.  I don't

18   see how that's relevant to the probable cause hearing.

19            MR. McHUGH:  Your Honor, these questions are

20   specifically tailored to the exact language in the affidavit,

21   knowing obviously the scope of these hearings, and that's what

22   I intend --

23            THE COURT:  I'll overrule the objection.  Why don't

24   you rephrase it again, repeat it, so the witness understands

25   it.

1  BY MR. McHUGH:

2  Q     Paragraph 6, beginning of the sentence, "National Park

3  Service rangers approached."  Do you have any idea -- you were

4  out there -- how many of these rangers approached the crowd?

5  A     Approximately 25.

6  Q     Okay.  Now I know you guys are able to do crowd

7  estimates.  Were you able to make a crowd estimate?  You talk

8  about the crowd.  That day were you able to make a crowd

9  estimate of the size of the crowd?

10           MS. NATALE:  Objection, Your Honor.  How is the size

11 of the crowd relevant to whether or not this defendant is --

12 we have probable cause of what this defendant did in violation

13 of the stature.

14           THE COURT:  Overruled.  You may proceed.

15 BY MR. McHUGH:

16 Q     You can answer it, sir.

17 A     Okay, can you repeat it again, please?  I'm sorry.

18 Q     Yes.  You make a reference there in your affidavit about

19 members of the crowd.  Do you see that?

20 A     Yes.

21 Q     Was there -- or can you tell us today what the estimate

22 -- did you count the crowd specifically?

23 A     No.

24 Q     Okay.  Are you able today to estimate?

25 A     We have -- we don't do estimates on crowd sizes.

1    Q    Can you estimate?  You were out there, you have 23 years

2    of law enforcement, can you estimate how many people were in

3    this crowd you're referencing?

4    A    No, sir.

5    Q    You can't make any estimate whatsoever?

6         THE COURT:  When you say the crowd, you mean those

7    that appeared to have marijuana cigarettes, that's the crowd,

8    or the crowd generally?

9         MR. McHUGH:  Okay, well, I'm talking about the crowd

10   generally.  I'm sorry, Your Honor.

11   A    There are people that were coming and going the whole

12   entire time.

13   Q    Okay.

14   A    There would be no way I could make estimates on it.

15   Q    Okay.  There were fences that were erected for this

16   event, is that right?

17   A    Bicycle -- yes.

18   Q    Those metal, where you could put a bike?

19   A    Yes.

20   Q    And they were placed around what I would call the speaker

21   stage, is that right?

22   A    They were further back.

23        MS. NATALE:  Objection.  That's beyond the scope of

24   the affidavit.  There's nothing about fences in the affidavit,

25   Your Honor.

1    MR. McHUGH:  Well, let me rephrase.

2    BY MR. McHUGH:

3    Q    The signs that you talked about being posted, they were

4    posted on these fences, is that right?

5    A    Yes, sir.

6    Q    Okay.  So now that we know that the signs that are in the

7    affidavit were on these fences, approximately how far were

8    they from the speaker stage?

9         If you don't know, sir, you don't know.

10   A    I don't know.

11   Q    Okay.  The crowd that you're referencing, and I'm talking

12   about the entire crowd of civilians, were they within these

13   fences?  Is that the crowd you're talking about within this

14   fenced off area?

15   A    Yes.

16   Q    Okay.  Now, you indicate that "Kokesh was next to and had

17   locked arms with a person who had a marijuana cigarette."  Do

18   you see that?

19        Same paragraph, paragraph 6.  "Kokesh was next to

20   and had locked arms with a person who had a marijuana

21   cigarette."  Do you see that?

22   A    Okay, yes, sir.

23   Q    Okay.  Did you observe that personally?

24   A    No, I did not.

25   Q    Who told you that he did that?

1    A    The ranger that was involved.

2    Q    Who's that?

3    A    That would be Keith Manchester.

4    Q    And did Keith Manchester tell you that personally or with

5    a written report, or both?

6    A    It was with a written report.

7    Q    Okay.  So you didn't do a verbal interview, oral

8    interview with Mr. Manchester, you just relied on his written

9    report?

10   A    Yes.

11   Q    Okay.  Did -- in the written report, did he identify who

12   that person was that had the marijuana cigarette that Kokesh

13   was allegedly locking arms with?

14   A    I'm sorry, say that again?

15   Q    Okay.  Same sentence.

16   A    Right.

17   Q    Moving a couple words further, it says, "locked arms with

18   a person who had a marijuana cigarette."  Do you see that?

19   A    Yes.

20   Q    Okay.  Did Manchester identify who that person was?

21   A    Yes.

22   Q    Okay.  What was the name of that person, if you recall?

23   A    Donald -- I'm not quite sure of the last name.  First

24   name was Donald, but I can't remember right now the last name.

25   Q    Did he get arrested?

1   A    No, he did not.

2   Q    Cited in any way?

3   A    He was issued a citation.

4   Q    Okay.  On the spot and allowed to leave?

5   A    Yes, sir.

6   Q    Okay.  It says "as the ranger approached."  Is that

7   ranger Keith Manchester?

8   A    Yes.

9   Q    Okay.  "Kokesh physically blocked."  Do you see that?

10  A    Yes, sir.

11  Q    Okay.  Again, did you observe that personally?

12  A    No, I did not.

13  Q    You're relying on this written report of Mr. Manchester?

14  A    Yes.

15  Q    Any other reports you're relying on besides Manchester?

16  A    For this?

17  Q    For this "physically blocked," the actions of Kokesh?

18  A    Derrick Pensinul (phonetic).

19  Q    I'm sorry, I didn't hear you.

20  A    First name is Derrick, last name is Pensinul.

21           THE COURT:  He's a ranger, I assume?

22           THE WITNESS:  Yes, sir.

23  BY MR. McHUGH:

24  Q    And so is Manchester, can we agree, is he a ranger also?

25  A    Yes.

1  Q     Okay.  So they both gave you written reports about the

2  physical blocking?

3  A     Yes.

4  Q     Okay.  Did any of those reports indicate any type of

5  punching or kicking or any type of threatening actions by

6  Kokesh?

7  A     Threatening actions?

8  Q     Well, this says physically blocked, on that issue.  I'm

9  going to go through some of these words with you, but any

10 kicking on that?

11 A     Kicking?  No.

12 Q     Any punching by Kokesh?

13 A     No.

14 Q     Did they give you any other description besides

15 physically blocked?

16         MS. NATALE:  Objection, Your Honor.  Again, he

17 doesn't have the reports in front of him.  We'll provide it

18 all in discovery.

19         THE COURT:  This goes to the heart of the matter, so

20 overrule the objection.  You may proceed.

21 BY MR. McHUGH:

22 Q     Did they give you any other description besides the words

23 physically blocked?

24 A     Physically blocked and/or obstructed the ranger.

25 Q     Well, we'll use that phrase then.  Did they -- first of

1    all, when we get to the obstructed, my same question,

2    obstructed, they didn't tell you that he kicked or punched or

3    anything like that, did they?

4    A    He was obstructing by -- while the rangers were trying to

5    make a contact with the person who they originally were going

6    to contact.

7    Q    Is that the Donald fellow?

8    A    Yes.

9    Q    Okay.  When you say make a contact?

10   A    The rangers advised that they saw somebody that they

11   thought was in possession of marijuana.

12   Q    Okay.

13   A    And through that, basically walked towards them to

14   address the issue.

15   Q    Okay.

16   A    And as they approached and got closer, one of the rangers

17   was -- the ranger was obstructed from doing the job because of

18   the fact that the ranger pushed -- or the ranger was pushed

19   and was grabbed by the arm, and was actively interfering with

20   us trying to deal with that individual, which then we had to

21   divert our attention to take care of Mr. Kokesh with his

22   physically blocking and grabbing at his hands and arm.

23   Q    Let me just ask you a question.  You said that the ranger

24   was pushed.  Where is that in your affidavit?

25   A    It's not in the affidavit.

1   Q    Okay.  Is it in the reports of Manchester?

2   A    I'm not sure.

3   Q    You're not sure.  Is it in the reports of Derrick

4   Pensinul?

5   A    Pensinul?

6         MS. NATALE:  Objection, Your Honor.  The affidavit

7   says, "as the ranger pushed forward."

8         MR. McHUGH:  Exactly.

9         MS. NATALE:  I believe the --

10        MR. McHUGH:  As the ranger pushed forward, not as

11  the ranger was pushed.

12  BY MR. McHUGH:

13  Q    Your affidavit, the only word about pushing is attributed

14  to a ranger, is that right?

15  A    No.

16  Q    Where else is there pushing of somebody besides a ranger?

17  A    There was -- the pushing basically came from the ranger

18  trying to break the hold of the tight grip that was being

19  held, that was being held on by.

20  Q    Sir, I'm not following you.  Let's go back.  "Physically

21  blocked and obstructed."  Can we agree nothing you -- you

22  didn't see any of this, is that right?  We're going off of the

23  reports of Manchester and Pensinul, is that right?

24  A    Well, what I saw was when Kokesh was brought back to --

25  or was in custody and was brought back to the area where I

 1   was.

 2   Q    Okay.  So your answer to my question, you didn't see any

 3   of this, is yes, I did not see any of this?

 4              THE COURT:  You personally, you didn't see this?

 5              THE WITNESS:  No, sir.

 6              THE COURT:  You relied on the reports.

 7              THE WITNESS:  Right.

 8              MR. McHUGH:  Okay.

 9   BY MR. McHUGH:

10   Q    And nothing in the reports that you received from

11   Manchester or Pensinul indicates that there was kicking or

12   punching of that nature when they reference the term

13   physically blocked or obstructed, right?  I think we've

14   already --

15   A    There was resistence.

16   Q    I said punching or kicking.  Right?  There's none of that

17   as far as Kokesh in the reports?

18   A    No.

19   Q    Okay.  Now we're going to get to -- I asked you, did they

20   describe in any other way besides the term physically blocked,

21   what Kokesh's actions were.  Do you recall if they did in the

22   report?

23   A    Yes.  That he grabbed them by the arm --

24   Q    We're going to get to that, but that's in the next

25   sentence.  Do you see that?  That's after the ranger pushes

1    Kokesh though, right?  I'm reading your affidavit.

2    A    Correct.

3    Q    All right, let's move on to the next sentence.  "As the

4    ranger pushed forward," do you see that?

5    A    Yes, sir.

6    Q    So the ranger is pushing, is that right?

7    A    I --

8    Q    That's confusing to you, "as the ranger pushed forward?"

9    A    For the reasons, I'm not sure why he pushed forward.  He

10   might have pushed forward --

11   Q    Don't speculate, sir.

12   A    Okay.

13   Q    We're going off of your sworn affidavit --

14   A    Right.

15   Q    -- that contains all the material facts.

16   A    Okay.

17   Q    Okay.  The ranger pushed forward, is that right?

18   A    I'm not sure.

19   Q    It's in your affidavit, "as the ranger pushed forward."

20   A    Right.

21   Q    You're now saying you're not sure if the ranger did that?

22   A    No, sir.  As stated.

23   Q    As stated what?

24   A    The push forward.

25   Q    As stated, the push forward what?  Are you denying that

1  the ranger pushed forward?  Are you saying that this affidavit

2  is incorrect on that fact?

3  A    No, sir, I'm not.

4  Q    Okay.  So that is a correct fact, is that right?

5  A    Yes, sir.

6  Q    And then the next sentence says -- and by the way, when

7  he pushed forward, do these two gentlemen that give you these

8  reports indicate who he pushed?

9  A    Who Kokesh pushed?  Yes.

10  Q    Okay.  We just talked about the ranger pushing forward.

11  A    Right.

12  Q    Does the affidavit --

13        MS. NATALE:  Objection, Your Honor.  I think he's

14  confusing the witness.  Nowhere in this affidavit does it say

15  the ranger pushed another person.  It just says he pushed

16  forward.

17        MR. McHUGH:  That's what I just asked, did he push

18  Kokesh.

19        THE COURT:  I'll overrule the objection.  You may

20  proceed.

21  BY MR. McHUGH:

22  Q    As the ranger pushed forward, did he push Kokesh?

23  A    I did not see him push forward or push Kokesh.

24  Q    I know.

25  A    I did not see him push forward or push Kokesh.

1    Q    I know.

2    A    I did not.

3    Q    But you put in your affidavit that you're relying on

4    reports of others, is that right?  We've already established

5    you were back when he got arrested.

6    A    A limited amount.  And once again, just for the

7    determination of probable cause.

8    Q    Well, this is a real hearing, isn't it?  Aren't we in

9    Federal Court?  This is for it, isn't it?  Twenty-three years

10   of law enforcement, right?

11              MS. NATALE:  Objection.

12              THE COURT:  That's argumentative.  I'll sustain the

13   objection.  Don't argue with the witness.

14              MR. McHUGH:  I'm sorry.

15   BY MR. McHUGH:

16   Q    You put in your affidavit the ranger pushed forward.  Are

17   you telling us now you're not sure about that?

18   A    I wasn't there to see that.

19   Q    But you put it in your affidavit.

20   A    That's -- I have things that I haven't seen also in the

21   affidavit.

22   Q    Okay.  So, but you don't make them up, do you?

23   A    No, sir.

24   Q    Okay.  So where did you get the fact that the ranger

25   pushed forward?  You didn't make it up, and you didn't see it.

1   So where did you get it?

2   A    From the ranger that was pushed.

3   Q    And who is that?  Was pushed?

4   A    That was Keith Manchester.

5   Q    When you say -- where does it say that a ranger was

6   pushed?

7   A    A ranger pushed forward.

8   Q    Are you saying that your language "as the ranger pushed

9   forward" is intending to -- what you meant by that was Kokesh

10  pushed the ranger?

11  A    I'm saying that I think that this is -- the ranger pushed

12  forward.

13  Q    Who did he push, do you know?

14  A    I don't know that he pushed anybody.  He just pushed

15  forward.

16  Q    Okay.  And then after the pushing forward in your

17  affidavit, is that right, comes the line that "Kokesh grabbed

18  the ranger by the arm to hold him back," is that right?

19  A    Yes.

20  Q    Okay.  So, by the way, did you see that, or are you

21  relying on the reports?

22  A    Relying on the reports.

23          MS. NATALE:  He already testified that he didn't see

24  that.

25          MR. McHUGH:  Okay.

1   BY MR. McHUGH:

2   Q    "Kokesh was then taken into custody," do you see that?

3   A    Yes.

4   Q    Next line, okay.  At any time when he's taken into

5   custody, was there any kicking, punching, things of that

6   nature?  By Kokesh.

7   A    No.

8   Q    Where you put in there, the affidavit, "Kokesh grabbed

9   the ranger," do you see that?

10  A    Yes.

11  Q    Do you know what he used to grab the ranger with?

12  A    Where it says Kokesh grabbed the ranger --

13  Q    Yes.

14  A    -- by the arm?

15  Q    Yes.

16  A    With his hand.

17  Q    You didn't see that, right?

18  A    No.

19  Q    And that will be in the report of Manchester or Pensinul?

20  A    Yes.

21  Q    Okay.  Do you know what arm he grabbed him with?

22  A    Right arm.

23  Q    Okay.  And that's in the report also, is that right?

24  A    Yes, sir.

25  Q    Okay.  And then "Kokesh was taken into custody."  Who

1    took him into custody?

2    A     Ranger Manchester.

3    Q     Okay.  If I could just clarify, when you said the right

4    arm, you meant Kokesh used his right arm?

5    A     No, he grabbed the ranger's right arm.

6    Q     Oh, okay, I'm glad I asked that again.  What hand -- I

7    was asking about Kokesh.  What hand did Kokesh use?

8    A     I don't know which hand he used.

9    Q     But is it your understanding from these reports that it

10   was a hand that he used to grab him?

11   A     Yes.

12   Q     Okay.  And you don't know which one?

13   A     No.

14   Q     Okay.  Did this -- so the officer in question in this

15   case then was Officer Manchester, is that right?

16   A     Yes.

17   Q     Was he injured in any way?

18   A     No.

19   Q     Did he miss any work as a result of anything?

20   A     No.

21   Q     No need for hospitalization then obviously?

22   A     No.

23   Q     In paragraph 7, "the cigarette that the ranger was

24   attempting to recover."  Is that again the ranger being

25   Manchester?

1   A     I'm sorry, can you repeat that?

2   Q     Paragraph 7.

3   A     Right.

4   Q     We've only got one more paragraph, 7 and 8 and then we're

5   done.

6   A     Got you.

7   Q     The cigarette that the ranger was attempting to recover,

8   is that ranger also Manchester?

9   A     Yes.

10  Q     And it was later seized by other rangers, is that right?

11         Do you see that?  Do you recall who those other

12  rangers were that seized this cigarette?

13  A     That would be --

14  Q     If you don't recall, sir, you don't recall.

15  A     I don't recall.

16  Q     Okay.  Was that the cigarette from Donald, is that who

17  we're talking about?

18  A     Yes, because -- I would say yes.

19  Q     Okay.  Mr. Kokesh was never seen smoking marijuana that

20  day, was he?

21  A     I didn't see him smoking any --

22  Q     You didn't receive any reports verbally or written that

23  he was smoking marijuana, did you?

24  A     No, he was standing next to somebody that was smoking

25  marijuana.

1   Q    Okay, so the answer is no to my question, is that right?

2   A    Yes.

3   Q    Okay.  And you didn't recover -- or the Government did

4   not recover any marijuana from Mr. Kokesh, did they?

5   A    No, sir.

6   Q    Okay.  Did you have any information about Mr. Kokesh

7   before this rally?

8            MS. NATALE:  Objection, Your Honor, relevance.

9            THE COURT:  Sustained.

10  BY MR. McHUGH:

11  Q    What other law enforcement agencies were out there

12  besides, you've mentioned the park rangers, you've mentioned

13  the Philadelphia police, were there other agencies out there

14  that day?

15  A    Other --

16            MS. NATALE:  Objection.

17            THE COURT:  Overruled.

18  A    There was one U.S. Fish & Wildlife Service ranger from

19  Tinicum.

20  Q    Okay.

21  A    I think that was it as far as PPD, ourselves, and the

22  ranger from Fish & Wildlife Service.

23  Q    Okay.  And so those were the only agencies involved in

24  this matter, is that right, at that time?

25  A    Yes.

1   Q    Okay.  I know you couldn't estimate the crowd, but you

2   indicated that there were at least 86, approximately 86 law

3   enforcement people out there.  Wouldn't it be fair to say

4   there were more law enforcement out there than people actually

5   participating in the rally?

6   A    I can't make an estimate.

7        (Pause)

8   Q    How did the law enforcement know the identity of my

9   client before he was taken and arrested?

10            MS. NATALE:  Objection, Your Honor.

11            THE COURT:  I'll overrule the objection.

12            Maybe you should ask --

13            MR. McHUGH:  You can answer.

14            THE COURT:  Wait.  Maybe you should ask the first

15   question, did they know his identity before.

16   BY MR. McHUGH:

17   Q    Did law enforcement know the name of Mr. Kokesh before he

18   was taken into custody?

19   A    Yes.

20   Q    And how did they know that?

21   A    Through whatever -- I can't say how they know of him.

22   Q    I'm sorry?

23   A    I couldn't speak to how they know him or how they -- I

24   mean --

25            THE COURT:  It's a vague question.  You're talking

1    about law enforcement in general.  Maybe you should ask him

2    did he know him.

3    BY MR. McHUGH:

4    Q     Did you know him?

5    A     Yes.

6    Q     Okay.  How did you know him?

7    A     Through contacts with other law enforcement agencies.

8    Q     Done prior to the rally?

9    A     Yes.

10   Q     Okay.  And who were these law enforcement agencies?

11   A     Philadelphia Police Department, their Civil Affairs

12   Division, those were the two that I could think of for now.

13   Q     Any other federal agencies?

14   A     The Federal Protective Service, and I'm not sure who

15   else.

16   Q     Could there have been other federal agencies?

17   A     Yes.

18   Q     Okay.  And so prior to this rally, had you sought out

19   this information or had they relayed it to you?

20              MS. NATALE:  Objection, Your Honor.

21              THE COURT:  I'll sustain the objection.

22   BY MR. McHUGH:

23   Q     How long prior to this day were you in possession of that

24   information of who Mr. Kokesh was?

25   A     I have no idea.

1   Q    Did you actually bring a photograph of him to the rally?

2   A    No, I did not.

3   Q    So you were that familiar with him that you knew him by

4   face?

5              MS. NATALE:  Objection, Your Honor.

6              THE COURT:  Overruled.

7   A    Yes, from being on stage, past events that we had.

8   Q    Okay.  So from past events at the park, you knew him from

9   those?

10  A    Yes, sir.

11  Q    Was there any discussion about arresting Mr. Kokesh prior

12  to the start of the rally --

13  A    No.

14  Q    -- amongst you and other law enforcement?

15  A    No.

16  Q    No discussion whatsoever?

17  A    No.

18  Q    Whether it be verbal or through electronic communication?

19  A    No.

20             MR. McHUGH:  That's all we have, Your Honor.

21             THE COURT:  Yes, go ahead.

22                        REDIRECT EXAMINATION

23  BY MS. NATALE:

24  Q    You testified about a fence, is that correct?

25  A    Yes.

1    Q    Were there gaps in the fence?

2    A    There were large gaps in the fence to where egress was

3    not an issue at all.

4    Q    And just to make clear, your affidavit, that is a summary

5    and it doesn't include exact quotes from any reports, is that

6    correct?

7    A    That's correct.

8              MS. NATALE:  Nothing further, Your Honor.

9              THE COURT:  Anything else, Mr. McHugh?

10             MR. McHUGH:  No, Your Honor.

11             THE COURT:  Okay, I'll hear argument.  Do you want

12   to go first, Mr. McHugh?

13             MR. McHUGH:  Sure, Your Honor.

14             THE COURT:  You're excused, sir.

15             MR. McHUGH:  Your Honor, looking at the statute

16   Section 111, assaulting, resisting or impeding certain

17   officers or employees.  Now, obviously the complaint that we

18   have is just vague, it's just general.  It just cites to that

19   Section 111.  I don't know why the Government chose to do

20   that.  But I do know from the Government's detention memo that

21   they aver that it's essentially the second --

22             THE COURT:  A(2)?

23             MR. McHUGH:  A(2), and then there's two descriptions

24   of simple assaults described in there.  There's one that's

25   punishable by imprisonment of one year.  And then two, where

1    such acts involve physical contact with the victim of that

2    assault or intent, eight years.  Do you see that?

3              THE COURT:  Yes.

4              MR. McHUGH:  Okay.  That's the one that's in the

5    detention memo so I presume that that's the one that the

6    Government is arguing, is present here.

7              THE COURT:  What do they have to show in your view?

8              MR. McHUGH:  I would suggest, Your Honor, under

9    either, under any interpretation of this statute, the

10   Government has to show by probable cause that simple assault

11   has been made out, when I read this statute.

12             So, when you look at --

13             THE COURT:  Just point to me the language.  I'm

14   sorry, Mr. McHugh --

15             MR. McHUGH:  That's okay.

16             THE COURT:  -- just go with me.  Where is the

17   language in 111 that shows that they have to show simple

18   assault?

19             MR. McHUGH:  Well, because there's no other

20   punishment.  It says "shall, where the acts in violation of

21   this section constitute only simple assault, be fined under

22   this title or imprisoned not more than one year or both."  Do

23   you see that, sir?

24             THE COURT:  Yes, sir.

25             MR. McHUGH:  Okay.  And then, and "where such acts

 1   involve physical contact with the victim of that assault, or
 2   the intent to commit another felony," then we go into the
 3   eight years or both.
 4           So both require the finding by the Court by probable
 5   cause of simple assault for this statute to apply.
 6           THE COURT:  Okay.
 7           MR. McHUGH:  So, then you think to yourself well,
 8   what is simple assault.  Well, if you look in the Third
 9   Circuit has looked at simple assault under this section, it's
10   not defined.  So they say, the Third Circuit, in the decision
11   I found, United States vs. McCulligan which is 256 F.3d 97,
12   that you go to the common law definition.
13           Now, in that case, the Government argued that it was
14   the Model Penal Code that applied.  But the Third Circuit
15   rejected the Government's argument as far as the Model Penal
16   Code and it said that you go back to the common law.  And what
17   they cited there, the case that, this 2001 case, is that they
18   found that simple assault is a crime committed by either a
19   willful attempt to inflict injury upon the person of another,
20   or by a threat to inflict injury upon the person of another.
21           You don't have that.  Take as true this affidavit of
22   probable cause.  You have the park ranger pushing through, and
23   Mr. Kokesh grabbing his arm.  And I think the language is "to
24   hold him back."  Grabs his arm to hold him back.  That's what
25   you have in this case.

 1          Taken as true, the Government's evidence does not

 2   make out simple assault.  And under the statute that they have

 3   charged, there's nothing less, there's nothing less than

 4   simple assault.

 5          So I suggest to the Court when you consider the

 6   language of the Third Circuit which is you go to the common

 7   law definition of simple assault, which is a willful attempt

 8   to inflict injury, there is nothing in this affidavit or the

 9   testimony you heard today that Mr. Kokesh was attempting to

10   inflict injury upon anybody.

11          The only evidence we have of a aggressive action is

12   the park ranger pushing, which took us about 20 minutes to get

13   through that.

14          So I think if you look carefully at the definition

15   of simple assault, it doesn't apply here.

16              THE COURT:  Do you have a copy of that decision?

17              MR. McHUGH:  I can hand up the copy I have, Your

18   Honor.

19              THE COURT:  Okay.  And where in the detention motion

20   do you read that the Government's proceeding under the, the

21   last section --

22              MR. McHUGH:  Well, when they talk about penalty, in

23   the section where they talked about penalty, when they talk

24   about eight years --

25              THE COURT:  Right.

1       MR. McHUGH:  -- that's where I said okay, that's

2   what they must be, since their complaint doesn't specify, I'm

3   reading between the lines here --

4       THE COURT:  Right.

5       MR. McHUGH:  -- in their detention memo that they

6   must be going for the eight-year one.

7       THE COURT:  Where it has to involve physical contact

8   with the victim?

9       MR. McHUGH:  Right.  And an assault.  And the

10  assault under the common law requires intent to injure.  You

11  don't have that.  Not any contact can be a crime, obviously,

12  and certainly Congress didn't intend that with the passing of

13  Section 111.

14      THE COURT:  Right, so it's like -- the first part

15  talks about an assault and the second part talks about a

16  battery.

17      MR. McHUGH:  Right.  And that the common law, a

18  simple assault was an attempted battery.

19      THE COURT:  Right.

20      MR. McHUGH:  And that's discussed in that case.

21      THE COURT:  Right.  Well, they are alleging physical

22  contact.

23      MR. McHUGH:  But it still requires an assault.  And

24  certainly --

25      THE COURT:  Right.  Which you're saying is an intent

1   to inflict injury.

2               MR. McHUGH:  Inflict injury.

3               THE COURT:  Right.  Okay.  Anything else, Mr.

4   McHugh?

5               MR. McHUGH:  I think my argument is that, Your

6   Honor.

7               THE COURT:  Counsel.

8               MS. NATALE:  Certainly, Your Honor.

9               Well, we're not proceeding under Section A(2).  A(2)

10  says "forcibly assaults or intimidates any person who formerly

11  served as a person designated in Section 114."

12              So we're not proceeding under Section A(2).  We're

13  not talking about someone who formerly served.  We're

14  proceeding under Section A(1) that reads "forcibly assaults,

15  resists, opposes, impedes, intimidates or interferes with any

16  person designated in Section 114 of this Title."

17              And I would disagree with counsel's -- I'm sorry?

18              MR. McHUGH:  I'm sorry.

19              MS. NATALE:  I would disagree with counsel's

20  interpretation of the law.  I don't have that case that he

21  handed up to Your Honor.  But I think the statute is very

22  clear, and I know that there is Third Circuit case law that

23  defines what the elements are of the statute.  It does not

24  require physical contact.  There's a Third Circuit case,

25  United States vs. Goodwin, a defendant is guilty of forcible

1   assault and resistance for simply pushing a federal agent.

2              In fact, there's a First Circuit case where just

3   spitting on a postal carrier falls within the description of

4   forcibly assaults, resists, impedes, interferes.

5              In fact, you don't need physical contact.  Even the

6   threat to inflict physical injury can be enough.  And while

7   not an expert on simple assault or what the common law is,

8   Your Honor, I know that simple assault can be just a threat.

9              So, physical contact is not necessary to satisfy the

10  section --

11             THE COURT:  You're not alleging a threat in the

12  affidavit.

13             MS. NATALE:  No.

14             THE COURT:  You're alleging minimal contact at the

15  minimum, the least.

16             MS. NATALE:  Yes.  No, I was just responding to --

17             THE COURT:  Right.

18             MS. NATALE:  -- counsel's representation to the

19  Court that the statute requires physical contact.  And the

20  statute does not require physical contact.

21             But in this case, the affidavit establishes probable

22  cause that the defendant forcibly impeded and interfered with

23  the rangers.  And it also establishes that the defendant

24  forcibly assaulted the officers.

25             What happened here was that the defendant, along

1   with Richard Tamaccio, was seen and heard over a loudspeaker

2   encouraging the crowd to smoke marijuana, and form a tight

3   circle and lock arms in order, and for the purpose of

4   physically impeding and interfering with law enforcement.

5          And as the ranger was approaching someone next to

6   the defendant who was smoking marijuana, the defendant

7   physically and obstructed him, and he grabbed the ranger by

8   the arm.

9          THE COURT:  But I'm not sure the evidence that was

10  presented to me just a moment ago showed that he went on the

11  loudspeaker and urged everyone to block the officers.  I'm not

12  saying you're not right, but I'm not sure in the record that's

13  presented that that's been presented.

14         Has it, Mr. McHugh?

15         MR. McHUGH:  No.  In fact --

16         THE COURT:  I don't remember that being brought out

17  that -- you can reopen the record if you want, but I don't

18  remember the ranger saying that Mr. Kokesh was actually

19  verbally urging everybody to block the officers.

20         MS. NATALE:  You're correct, Your Honor.  And the

21  affidavit is what I'm referring to.

22         THE COURT:  Is that in the affidavit?

23         MS. NATALE:  Yes.  During the event, Mr. Kokesh was

24  addressing the group over the loudspeaker system.  Mr.

25  Tamaccio urged over the loudspeaker that those present should

1   smoke marijuana and announce a countdown, and the crowd was

2   also urged over the loudspeaker to form a tight circle and

3   make it difficult for law enforcement.

4            THE COURT:  But the ranger just spoke a moment ago

5   and he said it was Mr. Tamaccio who was doing it.

6            MS. NATALE:  Yes, who was making that statement.

7            THE COURT:  He didn't say Mr. Kokesh was the one.

8            MS. NATALE:  They were both addressing the crowd,

9   Your Honor, and that's --

10           THE COURT:  But there's nothing in the record that

11  says it.  I'm not doubting you, but tell me, I don't believe

12  the officer said that a moment ago.  And it's not in the

13  affidavit, that he was the one.

14           MS. NATALE:  That he was the one that actually  said

15  that?  That may not be in the record, Your Honor.

16           THE COURT:  Right.

17           MS. NATALE:  But what I'm saying is that that's what

18  the crowd was directed to do.

19           THE COURT:  Okay.

20           MS. NATALE:  To hinder law enforcement.

21           THE COURT:  Okay.

22           MS. NATALE:  And he was over the loudspeaker as

23  well, directing the crowd to do things.  The crowd --

24           THE COURT:  But there's nothing in the record that

25  said that he was the one.

1          MS. NATALE:  Okay.

2          THE COURT:  Was there?  I mean tell me if there was.

3     I'm not --

4          MS. NATALE:  Well, that Mr. Tamaccio was addressing

5     the crowd --

6          THE COURT:  Right.  And you're saying Mr. Kokesh,

7     but I don't see anything in the record where he actually was

8     on the bullhorn telling everybody to --

9          MS. NATALE:  Okay.

10         THE COURT:  -- obstruct the arrest.

11         MS. NATALE:  You're correct, Your Honor.

12         THE COURT:  Right.

13         MS. NATALE:  I'm saying the crowd was told that.

14         THE COURT:  Okay.

15         MS. NATALE:  Not by him, but the crowd was told

16    that.

17         THE COURT:  Right.  Okay.

18         MS. NATALE:  To hinder law enforcement.  And then

19    just after the crowd was told that, this defendant did just

20    that.  When the ranger was trying to approach an individual

21    who was smoking marijuana, he physically obstructed and

22    impeded and got in front of the ranger, preventing him to

23    approach the person with the marijuana.  And then he grabbed

24    his arm.

25              Here, Your Honor, we've established more than enough

1    to show probable cause that the defendant forcibly impeded and

2    interfered with the rangers.  And also that he forcibly

3    assaulted them by grabbing the ranger's arm.

4          And with that, the Government arrests.

5          THE COURT:  Mr. McHugh?

6          MR. McHUGH:  If I may, Your Honor.

7          THE COURT:  Sure.

8          MR. McHUGH:  As to paragraph 5, the evidence is in

9    the record.  I specifically asked him each line as to who was

10   saying what.  And each and every time he mentioned Tamaccio is

11   the one.  Tamaccio is the one who urged over the loudspeaker,

12   tight circle, hinder law enforcement.  He said that

13   affirmatively, even though it's not in his affidavit.

14         Furthermore, there's no charge of conspiracy here.

15   There's no charge of conspiracy in this affidavit or this

16   complaint.

17         Then, when you get to counsel's argument about the

18   simple assault, look at the statute.  I'm not talking about

19   A(1)(2), a former officer of the Federal Government.  I'm

20   talking A(1).  But A(1) then goes into the next paragraph

21   after A(1)(2), which is "shall, where the acts in violation of

22   this section constitute only simple assault."

23         So there has to be a finding that they constitute

24   simple assault to be even punished by one year in jail.  And

25   what I'm saying is the Third Circuit says go to the common law

1   and look at what simple assault says.

2           And I agree with the Government, that simple assault

3   can mean not touching, because it's an attempted battery under

4   the common law.  But the attempt has to be with the intent to

5   inflict injury.  And that is where this affidavit is

6   deficient.  Because there is nothing in here that you can even

7   infer that Mr. Kokesh was doing anything to inflict injury.

8   He was pushed, he grabbed an officer's arm, or the ranger's

9   arm, to hold him back.  That's what the affidavit says, to

10  hold him back.

11          As far as the physically blocked and obstructed,

12  it's -- you still need the simple assault.  You need the

13  intent to injure, under this statute.

14          And so, given counsel's argument, I suggest a

15  careful reading of this statute, applying the common law, the

16  charge, even the one-year charge has not been made out.

17          THE COURT:  Let me ask the Assistant U.S. Attorney.

18  If you read A(1), okay, doesn't A(1) then flow into, or y have

19  to read the last paragraph of 111 which says that where the

20  acts in violation of this section constitute a simple assault,

21  or where such acts involve physical contact, isn't in fact Mr.

22  McHugh correct, that you have to show a simple assault?

23          MS. NATALE:  Your Honor, no, the Government

24  disagrees with --

25          THE COURT:  With his reading of 111?

1          MS. NATALE:  Yes.

2          THE COURT:  So the last paragraph of 111, I just

3    read A(1), and after the semi-colon duties, I ignore the rest

4    of it, and that only modifies A(2), is that what you're

5    saying?

6          MS. NATALE:  Your Honor, that's a grading section.

7    The Government's position is that if you read the first

8    sentence A(1), "forcibly assaults, resists, opposes, impedes,

9    intimidates or interferes," that that does not require an

10   assault.  That's why there's all the other words after the

11   word assault.

12         Forcibly, and the case law says this, forcibly does

13   apply to each and every word; forcibly assaults, forcibly

14   resists, forcibly opposes, forcibly impedes, and forcibly

15   intimidates or forcibly interferes.

16         But the statute does not require an assault.

17         THE COURT:  That only goes to the penalty portion of

18   the --

19         MS. NATALE:  Yes, the second part is a grading

20   section, Your Honor.

21         THE COURT:  All right.

22         MS. NATALE:  And the case law shows that.  And I can

23   provide that to you after the hearing, if you wish.

24         THE COURT:  All right.  Mr. McHugh, Your Honor.

25         MR. McHUGH:  But the statute does more than talk

1    about grading, because it goes into, and it talks about the

2    use of simple assault.

3         Counsel cannot deny that for it to be a one-year

4    penalty, maximum penalty of one year, there is no lesser

5    penalty in this statute, so for this statute to apply, that

6    they charged, that they charged, 111, the minimum, the most

7    least severe punishment of one year requires a simple assault.

8    And they haven't proven that.

9         THE COURT:  Okay.  Look, I'm going to take this

10   under advisement.  I'm going to look at this case.  I believe

11   Mr. McHugh raises some issues that really require me to look

12   at it.

13        But let's go to the issue of -- and I'll have a

14   decision out today -- let's go to the issue of detention or

15   release.  Have you been able to talk among yourselves as to

16   trying to work out some conditions of release?

17        MR. McHUGH:  I did briefly.  I got the Government's

18   detention memorandum.  I saw in there that they indicated that

19   they would be amenable to some conditions, and then I talked

20   further with counsel for the Government.  I said what

21   conditions are you talking about.  They said basically the

22   standard conditions.

23        THE COURT:  Right.

24        MR. McHUGH:  And so, I have talked to my client, and

25   I don't think we're probably going to be able to agree to the

Colloquy                                    51

1   standard conditions that the Government is referring to.

2           THE COURT:  All right, just a moment.

3           MR. McHUGH:  So at this time, I don't think -- at

4   this time, I know there's not an agreement as to that.

5           THE COURT:  All right, Mr. Goldberg.

6           MR. GOLDBERG:  Your Honor, the Government has always

7   been willing to entertain the standard conditions that every

8   defendant in this country is asked to provide when they're

9   released after being charged.

10          The defendant has refused to provide any information

11  whatsoever.  This is not --

12          THE COURT:  What information hasn't he provided?

13          MR. GOLDBERG:  My understanding, Your Honor, is that

14  other than his name and that he is from San Francisco, that's

15  about it.  So that we don't have location, former addresses,

16  employment, family ties, whether he's any kind of danger to

17  the community because of firearms.  He has done nothing to

18  indicate that he intends to appear in Court, that he is

19  locatable, that he has a stake in appearing in Court, that

20  he's willing to post anything, that he has any regard frankly

21  for the authority of this Court.

22          And to be crystal clear about it, Your Honor, this

23  is the defendant's choice.  The Government, just as with Mr.

24  Tamaccio, will be happy to consult with counsel and to come to

25  an agreement as to Mr. Kokesh's release.  Mr. Kokesh is his

1  own jailer.  When he wants to be freed, he can participate in

2  the Court process, and I'm sure that the Government will be

3  able to come to some terms.

4        I can't speculate as to the reason that he wants to

5  stay in custody, but it is his decision alone.  And given the

6  fact that we have absolutely no assurances, the Government

7  asks that he remain in custody.

8        THE COURT:  Go ahead, Mr. McHugh.

9        MR. McHUGH:  Your Honor, just briefly.  As to the

10  comments by the Government both before Your Honor and in this

11  memorandum.

12        I spoke personally with Mr. Harris, the Pretrial

13  Services officer.  He told me, contrary to the allegations of

14  the Government, that Mr. Kokesh did --

15        THE COURT:  How do you pronounce your name?  Is it

16  Kokesh or --

17        MR. McHUGH:  Kokesh.

18        THE COURT:  Okay.

19        MR. McHUGH:  He did provide his name, he did provide

20  his date of birth, he did provide his Social Security number.

21  He provided his father's name.  He provided his father's phone

22  number.

23        THE COURT:  How about an address?

24        MR. McHUGH:  He did not provide that.

25        THE COURT:  Mr. Kokesh, if you'd just give us your

Colloquy                                    53

1    address and a phone number.  And why do we need it?  Any

2    defendant that's arrested, we need to locate them, we need to

3    send them Court notices so they can appear and they can fight

4    these charges.  We also just need to keep track of where

5    you're going to be if we need to find you.

6             That's all we're asking for.  I'll release you

7    today.  Just give me an address and a phone number that could

8    be verified, that we could just check it out and in fact it's

9    true.  That's all I'm asking you, and I'll release you today

10   on standard conditions.  And this will all be over with.

11            So talk to Mr. McHugh.  Just address, phone number,

12   where we can find you, so you can report to Pretrial Services

13   until this matter is resolved.  It's in your interest, because

14   obviously you believe you're innocent of these charges.  You

15   want to get out of jail so you can consult with Mr. McHugh and

16   fight these charges.

17            So talk to him for a minute.  Give us the address,

18   give us the phone number.  Pretrial Services is here, and

19   we'll see if we can work this out.

20            Yes, sir?

21            PRETRIAL SERVICES OFFICER:  Can we go to sidebar,

22   Your Honor?  Pretrial.  I can let you know what the issue is.

23            THE COURT:  Go ahead.

24            PRETRIAL SERVICES OFFICER:  The issue is, first,

25   Your Honor, there are standard conditions of bail, as you're

Colloquy                                        54

1   aware.  And if Mr. Kokesh is going to say to counsel that I'm

2   not going to abide with even the standard conditions of bail,

3   this is going to be around and around and around, coming back

4   to Your Honor to say he's not complying.

5           THE COURT:  Well, we haven't gotten to that.

6           PRETRIAL SERVICES OFFICER:  Okay.

7           THE COURT:  I haven't imposed conditions, and I've

8   got to get to first base first, which is getting us an

9   address, give us a phone number, and then we'll discuss

10  conditions.  And when I impose conditions, you're going to

11  have to comply with them to be released.

12          PRETRIAL SERVICES OFFICER:  Thank you, Your Honor.

13          THE COURT:  And if you don't comply with them, then

14  obviously I can't release you.  So we'll just talk about the

15  conditions.  This is nothing unusual.  This is done every day,

16  hundreds of times, Mr. McHugh can tell you.  You've got to

17  give us an address and a phone number so we can contact you.

18          Because depending what I do, you know, I don't know

19  what I'm going to do with this case, but if it goes forward,

20  we need to contact you.  That's as simple as it can be.

21          Go ahead, Mr. McHugh, why don't you talk to your

22  client.

23          MR. McHUGH:  Sure.  Thank you, Your Honor.

24      (Pause)

25          MR. McHUGH:  Your Honor, Mr. Kokesh would not be

Colloquy                                              55

1   willing at this time to -- he considers it a violation of

2   privacy to give his address without knowing what the

3   conditions would be.

4           As described to him, probably some of the conditions

5   that the Government, I described as standard, will probably be

6   unacceptable.  But obviously I know that that's the second

7   stage, and obviously we can argue that out with the Court.

8   But as far as getting the address, he's not willing to go

9   forward giving the address without knowing what these

10  conditions would be, because essentially he'd be giving up

11  some privacy interests and potentially not accepting the

12  conditions anyway.

13          Does that make sense to the Court?

14          THE COURT:  No, it doesn't.

15          MR. McHUGH:  I mean, not make sense, but what --

16          THE COURT:  If you look at Title 18 Section 3153,

17  all the information you provide to Pretrial Services cannot be

18  used against you in any way in any criminal proceeding.  You

19  can look at that.  It's 3153, Title 18.  This is basic

20  information that can't be used against you.

21          And I'm telling you that, and Mr. McHugh will

22  confirm that.  So, you don't bargain with the Court over the

23  conditions.  You don't say "you tell me what the conditions

24  are and then I'll give you the information."  That's not the

25  way it works.  We just need basic information.  I want to

Colloquy                                                    56

1   release you today.  I want to get this thing over with.  But I

2   need to know where you're going to be.

3           Because if I want to send a notice or the clerk of

4   the Court as to you have to appear next week, where do we send

5   it to?  It's basic.  You're a smart guy, you're a rational

6   guy, so just work with us.  We can discuss the conditions.

7   Mr. Goldberg will say I want XYZ conditions.  Mr. McHugh will

8   say they're not acceptable.  I'll hear it and I'll work it

9   out.

10          But the bottom line is once I say these are the

11  conditions, you have to comply.  So, Mr. McHugh, talk to him

12  again.

13          (Pause)

14          MR. McHUGH:  Your Honor, again, a little bit of the

15  cart before the horse.  There's a single condition at this

16  time that Mr. Kokesh is objecting to, and that's the

17  possession of firearms.

18          And so, he will provide an address to the Court if

19  that is now going to be a condition of his release.  And I

20  know from looking into this under the Bail Reform Act, that

21  that is not a required condition.  It is a condition that the

22  Court can consider, and I know I don't want to get into

23  argument about this yet --

24          THE COURT:  Right.

25          MR. McHUGH:  -- but it is not by any means a

1   mandatory condition.

2           THE COURT:  You're negotiating, and you can't do

3   that.  You know, that's a good argument, as to whether -- I

4   don't know what I'll do as to whether I'll impose a condition

5   on firearm.  There's a good argument why that's not necessary

6   in this case.  I don't know yet.

7           You can't say to me "I'm not gonna give you my

8   address unless you agree to this."  It just doesn't work that

9   way.  If you won't agree to your address, if you won't provide

10  and cooperate with Pretrial Services, I have no alternative.

11  I have to detain you, and you're going to stay in there until

12  you give us the information.

13          I don't want to do that.  You're making that

14  decision.  You have the keys to your freedom right now.  Just

15  give us the basic information.  You're asking us to treat you

16  differently than the thousands of people that are arrested.

17  We're not going to do that.

18          If you provide your information, we'll have an

19  argument.  And perhaps a firearm condition is not appropriate

20  in this case.  I don't know, I haven't heard from Mr. McHugh,

21  I haven't heard from Mr. Goldberg.

22          I'll give you one last chance.  If you provide the

23  information, if you don't, you're going to be detained.  I

24  don't want to do that but you're giving me no other choice,

25  and we'll have a hearing next week to determine the status of

Colloquy                                58

1    your bail.

2              And in the meantime I'll decide these issues of the,

3    you know, the probable cause issues which are substantial, and

4    I'll look at them.

5              Mr. McHugh, go ahead.

6         (Pause)

7              MR. McHUGH:  Mr. Kokesh will be agreeable to release

8    his address if it's possible to be kept under seal.  Obviously

9    Pretrial would know it, the Government would know it, and the

10   Court would know it.

11             THE COURT:  Mr. Goldberg?

12             MR. GOLDBERG:  Your Honor --

13             THE COURT:  It won't be under seal because it will

14   be in the Court records.  You know, there will be a Court --

15   there's a docket.  In other words, each case, the clerks

16   generate what's called a docket.  And on the docket it would

17   have your address on it, because the clerk, who's somebody

18   down in the Clerk's Office, would have to know to whom to send

19   notices, and they'll have to look at your address.  We just

20   don't do that.

21             And Mr. McHugh knows that too.

22             MR. McHUGH:  I understand.  But I do think that if

23   it was kept under seal -- you're saying that it would have to

24   appear as part of the docket?

25             THE COURT:  Yes.

Colloquy                                        59

1          MR. McHUGH:  There is an argument in this.  He's

2    given the condition that is at issue and the address.  He has

3    a concern of his own personal safety.  If somehow that address

4    were released to the public and then that condition was

5    applied to him, then he's concerned for his own personal

6    safety.

7          THE COURT:  Oh, you mean the condition of the

8    firearm?

9          MR. McHUGH:  Yes.  So there's a bit of a link of the

10   two issues.  But he is willing to give his address, obviously

11   to the parties that need the address for Court notices, but he

12   just does not want that released to the public.

13         THE COURT:  Well, he's got -- now he's negotiating.

14   He's got to talk to Pretrial Services.  I have to rule on

15   this.

16         MR. McHUGH:  Okay.

17         THE COURT:  Mr. Kokesh, you've got to follow the

18   rules.  And the rules are you need to interview with Pretrial

19   Services, you need to provide that information.  I told you

20   that this information is confidential.  It's not disclosed,

21   only to me, to the U.S. Attorney and also to your defense

22   lawyer.

23          I haven't made any decisions as to what conditions

24   are -- that I would impose on you in this case.  But until you

25   provide us the basic information, unfortunately I have to

Colloquy                                              60

1    order your detention.

2           I want you to think about this.  I'll schedule --

3    I'm going to enter an order of detention, ordering you

4    detained until you give me this information.  We'll have a

5    hearing on Tuesday before Judge Carol Wells, different judge,

6    to see how you want to proceed with this.  But I'm prepared to

7    release you today as long as you do what every other defendant

8    does in this courthouse, is to provide the basic information.

9           I am not prejudging, I have no idea what the proper

10   conditions are.  I know you're a veteran.  I don't think

11   you're a risk of flight.  I don't think this is an unusual

12   case so I don't see any special circumstances of, you know,

13   that this is any special case, anything different than

14   anything else.

15          So I'm prepared to release you but you've got to

16   comply.  And if you don't comply, you're making a decision

17   that you want to stay in jail.  So I'm going to order you

18   detained.  That's it.  Okay?

19          And in the meantime, I'll look at your argument very

20   carefully, Mr. McHugh, on the probable cause.  All right,

21   Court's adjourned on this case.

22          MR. McHUGH:  Thank you, Your Honor.

23       (Proceeding concluded at 2:46 p.m.)

24                         *  *  *  *

61

1

2

3                        **C E R T I F I C A T I O N**

4

5              I, Sandra Carbonaro, court approved transcriber,

6    certify that the foregoing is a correct transcript from the

7    official electronic sound recording of the proceedings in the

8    above-entitled matter.

9

10

11

12    _____

13    SANDRA CARBONARO

14

15    <u>Diana Doman Transcribing</u>              _____

16    AGENCY                                   DATE

17